# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MILWAUKEE DEPUTY SHERIFFS ASSOCIATION,
MARK ZIDEK and ILIR SINO,
        Plaintiffs,

    v.                                        Case No. 06-C-602

DAVID A. CLARKE JR., EDWARD BAILEY
and MILWAUKEE COUNTY,
        Defendants.

## DECISION AND ORDER

Plaintiffs Mark Zidek and Ilir Sino, both Milwaukee County Sheriff's Deputies, together with their union, bring this § 1983 action against Milwaukee County Sheriff David Clarke Jr., Sheriff's Captain Edward Bailey and Milwaukee County. Plaintiffs allege that defendants violated the Establishment and Free Exercise Clauses of the Constitution. Defendants move for summary judgment and plaintiffs also move for summary judgment on the issue of liability.

## I. BACKGROUND

In 2006, members of Elmbrook Church, an evangelical Christian church, formed an organization of law enforcement officers called the Fellowship of Christian Centurions ("Centurions"). They invited law enforcement officers throughout Wisconsin to join, explaining that the organization would assist them in dealing with stress through "Bible study with encouragement and support." (Second Pings Aff. Ex. 5 (Clarke Dep. Ex. 1).) After receiving the Centurions' invitation, defendant Clarke initiated a meeting with Centurion leaders and subsequently invited them to make a presentation at a Sheriff's Department ("Department") leadership conference, which all deputies with the rank of sergeant or above were required to attend. Defendant Bailey arranged the presentation.

At the conference, Clarke first explained to the deputies the criteria that he would use in deciding who he would promote to captain. Clarke also distributed written material, which included a quotation from the Bible and an instruction to deputies to build an inner circle of advisors, which included people who among other things were "people of faith." (Second Pings Aff. Ex. 5 (Clarke Dep. Ex. 12).) Subsequently, Bailey introduced the Centurions, one of whom addressed the deputies as follows:

> In a few minutes [another Centurion] will describe an [opportunity] coming up for police, parole and correctional [officers]. But first I'd like to mention a few things for your consideration. Whether or not we acknowledge it, each of us here today has a high calling and corresponding responsibility. Civil government was God's idea. The first several verses of Romans 13 tell us He established government and that people in authority are ministers of God assigned to promote good and punish evil. The implied accountability there is a sobering thought. Your task is unique in that society expects you to be a force for integrity, strength and justice; an officer who makes quick, correct analyses that lead to decisive actions. This can certainly be a catalyst for stress, anxiety and introspection. You often see the worst of the human condition, but you're the ones expected to keep your head, not to lose perspective. You're going to be critiqued everywhere from the kitchen table to radio talk shows. Being the least understood and experiencing a lack of support are probably commonplace. Being taken for granted is a given. How do you balance all this? Where do [you] gain strength and become refreshed, healed from scars that can go deep? Can you shut this all off and be a balanced parent and spouse? Or neighbor/friend? Grappling with enormous pressure while realizing that some level of evil plays a role in each of our lives can be discouraging, maybe defeating. That's why Paul tells us in his letter to Timothy to pray for those in authority. I don't like to admit it but my life is fragile – the book of James tells us that life appears like a mist and it's gone. I'm really not the captain of my own ship. Fortunately, the same God who ordained authority inspired a book and sent a counselor that promises to give us guidance on how to navigate life's road.

(Second Pings Aff. Ex. 3 (Melang Dep. Ex. 8).)

A second Centurion also spoke, and the Centurions distributed written material inviting deputies to participate in the organization and to attend a kickoff at Elmbrook Church at which Centurions would make presentations and officers could discuss how to "impact others for Christ" and "how Christ can impact your life." (Felber Aff. Ex. B.) The Centurions also made

-2-
Case 2:06-cv-00602-LA   Filed 09/25/07   Page 2 of 13   Document 78

available copies of a book about Christian faith called Putting the Pieces Back Together: How Real Life and Real Faith Connect, and Bailey told deputies where they could pick up the books.

At some point, Clarke instructed Bailey to arrange similar Centurion presentations at Department "roll calls," meetings held at the beginning of each work shift at which supervisors make announcements, and Bailey did so. Deputies are required to attend the roll call held at the beginning of each shift that they work. Centurions attended sixteen roll calls and each time offered condensed versions of their leadership conference presentations, distributed the same Christian-infused written material and made available the same book about Christian faith.

Plaintiffs Sino and Zidek, who are Muslim and Catholic respectively, were made uncomfortable by the Centurion presentations. Sino walked out of a roll call in protest. Zidek attempted to challenge the Centurion speaker, but a supervisor told him that he would have to raise his concerns at another time. Zidek complained to Bailey about the Centurion presentations and Bailey relayed the complaint to Clarke, but Clarke continued to allow the presentations. Plaintiffs then commenced the present action seeking damages and an injunction barring defendants from permitting Centurion presentations at future Department events.

I will cite additional facts in the course of my decision.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a dispute to be genuine, the evidence must be

-3-
Case 2:06-cv-00602-LA   Filed 09/25/07   Page 3 of 13   Document 78

such that a "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, I must draw all inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When both parties have moved for summary judgment, both are required to show that no genuine issues of fact exist, taking the facts in the light most favorable to the party opposing each motion. If issues of fact exist, neither party is entitled to summary judgment. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341, 349 (7th Cir. 1983).

### III. ESTABLISHMENT CLAUSE CLAIM

The Constitution's Establishment Clause, made applicable to the states by the Fourteenth Amendment, prohibits governmental entities from making "any law respecting an establishment of religion." The "touchstone" of the Clause is "'the principle that the First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" Vision Church v. Vill. of Long Grove, 468 F.3d 975, 992 (7th Cir. 2006) (quoting McCreary Co. v. Am. Civil Liberties Union, 545 U.S. 844, 860 (2005)). Government violates this principle when it "'acts with the ostensible and predominant purpose of advancing religion,'" and it acts with such purpose if: (1) the actual purpose of its action is entirely religious in nature; (2) the primary effect of its action is the promotion or inhibition of religion; or (3) its action creates excessive administrative entanglement between religion and government. Id. (quoting McCreary, 545 U.S. at 860 (citing Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971)). If government violates any of the three prongs of this "Lemon test," its "action . . . must fall." Sherman v. Cmty Consol. Sch. Dist. 21, 8 F.3d 1160, 1164 (7th Cir. 1993).

Plaintiffs primarily argue that defendants violated Lemon's second prong.[1] The critical question under such prong is whether "a reasonable person, apprised of the circumstances surrounding [defendants' actions], would conclude that [such actions] amounted to an endorsement of religion." Vision Church, 468 F.3d at 993. In response, defendants make three arguments: (1) that the Centurions are not a religious organization; (2) that even if it is, its message to the deputies was not religious; and (3) that even if its message was religious, a reasonable observer would not have regarded defendants' actions as an endorsement of religion. Defendants' argument that the Centurions are not a religious organization is not worthy of serious discussion. Members of an evangelical church created the organization at meetings held at a church, the organization's literature contains numerous references to Christ and the name of the organization is the "Fellowship of Christian Centurions."[2] Although the Centurions do not bar non-Christians from joining, this is so because, as one Centurion testified, "Christianity is just a wide-open door." (Scott Aff. Ex. 5 (Melang Dep. at 48).)[3]

The record also fails to support defendants' argument that the Centurions presented a simple announcement. The evidence shows that the Centurions presented a religious message. At the leadership conference, one of the Centurion speakers instructed deputies that civil government was "God's idea" and that they were "ministers of God." (Id.) He quoted the Bible's Book of James and informed deputies that "God who ordained authority inspired

---

[1] Plaintiffs also argue that defendants' actions violated Lemon's first prong. However, because I conclude that defendants violated Lemon's second prong, I will not address this argument.

[2] The organization's name identifies it as Christian in nature and suggests that its members are Christian soldiers. See American Heritage Dictionary 253 (2d college ed.) (defining "centurion").

[3] The Centurion witness added that non-Christians "might wind up disagreeing with what's being taught there in the end and leave." (Id.)

a book and sent a counselor" to help them deal with the stresses of their God-given authority. (Id.) A second speaker announced the kickoff event and distributed information about it encouraging deputies to learn how to "impact others for Christ" and "how Christ can impact your life." (Felber Aff. Ex. B.) The Centurions also made available copies of a book about Christian faith that was unrelated to the kickoff event or to law enforcement. At the roll calls, the Centurions made shorter but similar oral presentations and distributed the same Christian written material and made available the same book about Christian faith. As one Centurion testified: "the whole intent of my message is the Christian gospel, period." (Second Pings Aff. Ex. 3 (Melang Dep. at 34).) These presentations amounted to religious proselytizing.[4] See Venters v. City of Delphi, 123 F.3d 956, 970 (7th Cir. 1997) (concluding that compelling a public employee to "submit to…religious dialogues" involved sending a religious message); Kerr v. Farrey, 95 F.3d 472, 479-80 (7th Cir. 1996) (finding Alcoholics Anonymous meetings to be a religious activity); Berger v. Rensselaer Cent. Sch., 982 F.2d 1160, 1171 (7th Cir. 1993) (holding that distributing Bibles in a public school conveyed a religious message).

Of course, purely private speech, even proselytizing speech, does not offend the Constitution. Pinette, 515 U.S. at 760. Thus, I turn to defendants's third argument – that their actions related to the Centurions' presentations did not convey a message of endorsement. I conclude that defendants' action indeed conveyed a message of endorsement. After receiving notice of the formation of the Centurions and an invitation to participate, Clarke contacted Centurion representatives and advised them of his interest in the organization and

---

[4] Even if the Centurion presenters had confined their discussion to the founding of their organization and the upcoming kickoff, the presentation might still have violated the Establishment Clause. A governmental entity may not constitutionally invite a religious sect to make a thirty minute presentation about an upcoming sectarian event while relegating other sects to a bulletin board. See Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 763 (1995).

discussed its mission and the upcoming event at Elmbrook Church. He then met with them and invited them to make a twenty to thirty minute presentation at the leadership conference.[5] Although Centurion founders sent materials to the heads of every law enforcement agency in Wisconsin, Clarke was the only agency head to ask for a meeting or to invite Centurion representatives to speak to officers. Clarke and Bailey placed the Centurions on the conference's agenda and made no attempt to limit the content of their presentation. Bailey introduced the Centurions and assisted them in distributing their books at the end of the presentation.

The Department holds leadership conferences four times a year and requires high-ranking deputies to attend. At each 2006 conference, Clarke invited one outside organization – a "particularly good civic partner[]" – to make a presentation. (See Second Pings Aff. Ex 4 (Bailey Dep. at 9).) Each previous invitee was a secular organization with which the Department had partnered on a specific project. Such organizations included Companion's Rest, which had contributed money to the Department's canine unit; Johnson's Bike Company, which had supplied bicycles for the Department's bicycle patrol unit; Walter's Train Supply Company, which had constructed a model of the county's freeway system for the Department; and Gift of Wings, which created a kite for the Department.

Clarke also invited the Centurions to make presentations at Department roll calls, and Bailey scheduled those presentations. Clarke invited the Centurions to speak at all of the Department's roll calls, but Centurion representatives were only available for sixteen of them.

---

[5] One of the presenters believed that Clarke had invited them to present for a shorter period of time. (Scott Aff. Ex. 5 at 32 (Melang Dep.).) However, it is clear that he misspoke, as Clarke and the other presenter agree that the invitation was for a longer presentation, and the conference agenda indicated that the Centurions would speak for thirty minutes. (Clarke Dec. at ¶ 3; Scott Aff. Ex. 4 at 22 (Papachristou Dep.).)

-7-
Case 2:06-cv-00602-LA   Filed 09/25/07   Page 7 of 13   Document 78

Although both Clarke and Bailey had witnessed the leadership conference presentation, neither of them asked the presenters to limit the content of their roll call talks. Clarke also authorized members of his command staff to introduce the Centurion speakers at each roll call. In addition, Department staff prevented plaintiff Zidek from challenging assertions made by Centurion speakers. Finally, even after Zidek complained, defendants refused to curtail the presentations or to provide Zidek with some other form of relief.

As in the case of the leadership conferences, it was relatively rare for Clarke to invite outside organizations to make presentations at roll calls. Typically, organizations made announcements by posting them on a bulletin board in the roll call room. Occasionally, Department staff would read an announcement on a flyer out loud. Clarke had permitted only a few organizations, all secular in nature, to make presentations at roll calls. However, such organizations were all secular in nature and Clarke had identified them as organizations with which he wanted the Department to "partner." (Scott Aff. Ex. 11 (Clarke Dep. at 29).)[6] Such invitees included the Alliance for Blacks in Law Enforcement, United Performing Arts Fund, Big Brothers and Big Sisters, the United States Marine Corps, the National Latino Peace Officers Association, the United Way, and the Child Abuse Prevention Fund. Typically, these organizations asked for volunteers or financial support for special projects.

Thus, a reasonable deputy who was aware of the nature and history of leadership conferences and roll calls and of defendants' actions in connection with them, and who attended a leadership conference or roll call at which Centurion speakers made presentations, would have concluded that the Department was "partner[ing] with" the

---

[6] Clarke testified that he could not remember denying a community organization's request to appear at a roll call. However, this testimony is misleading because no evidence in the record suggests, nor is there any reason to believe, that any organization would have known to make such a request without Clarke first initiating a conversation about it.

-8-
Case 2:06-cv-00602-LA   Filed 09/25/07   Page 8 of 13   Document 78

Centurions and endorsing its message. (See Scott Aff. Ex. 11 (Clarke Dep. at 29).) In fact, no reasonable deputy could have concluded that the Department was not promoting the Centurions' message. See Vision Church, 468 F.3d at 993. Nor could a reasonable deputy have missed the Christian proselytizing in the Centurions' message or failed to infer from the continued presence of Centurion representatives at roll calls that the Department was behind such proselytizing.

Defendants' actions are particularly troubling because defendants promoted religion through the "coercive power of government." County of Allegheny v. Am. Civil Liberties Union, 492 U.S. at 660 (1989) (Kennedy, J., dissenting).[7] Cases involving coercion typically deal with populations over which government exercises particularly strong control. See, e.g., Venters, 123 F.3d at 970 (involving public employees); Kerr, 95 F.3d at 479-80 (involving state prisoners); Berger, 982 F.2d at 1171 (involving public school children). In Venters, the Seventh Circuit held that an allegation that a supervisor repeatedly attempted to convert a public employee to Christianity stated an Establishment Clause claim. Id. The present case involves coercion because defendants required deputies to attend the leadership conference and/or roll calls and did not advise them that they could skip the Centurions' presentations or offer them an opportunity to comfortably dissent. See Pinette, 515 U.S. at 777 (1995) (O'Connor, J., concurring) (stating that the Establishment Clause "imposes affirmative obligations that may require a State, in some situations, to take steps to avoid being perceived as supporting or endorsing a private religious message").

---

[7]Although Supreme Court justices disagree about a number of Establishment Clause issues, there is "virtually no dispute" that "government efforts to coerce anyone to support or participate in religion or its exercise" violate the Establishment Clause. Kerr, 95 F.3d at 477-78.

Even if defendants had authorized deputies to exit during the Centurions' presentations, a reasonable deputy likely would have felt compelled to stay. As stated, a reasonable officer would have inferred from the Centurions' presence that the Department had partnered with their group. Further, before the Centurions spoke at the leadership conference, Clarke discussed promotion criteria and distributed written material recommending among other things that deputies surround themselves with people of faith. A reasonable deputy could easily have inferred that receptiveness to the Centurions' message would impress Clarke and increase his or her opportunities for advancement. Further, the employer-employee relationship is inherently somewhat coercive and law enforcement officers may be particularly vulnerable to employer coercion given their strict chain of command. See Mellen v. Bunting, 327 F.3d 355, 371 (4th Cir. 2003) (stating that cadets at the Virginia Military Institute were "uniquely susceptible to coercion" due to the Institute's detailed regulation of conduct and its philosophy of "[o]bedience and conformity").[8]

Defendants contend that they did not promote religion but merely permitted a religious organization to use a public forum so as not to discriminate against religion and violate the Free Exercise Clause. However, this argument fails. Although a governmental entity may not bar religious organizations from using a public forum , Widmar v. Vincent, 454 U.S. 263, 271 (1981), the present case does not involve access to a public forum but rather access to a captive audience of government employees. See Berger, 982 F.2d at 1167 (stating that a "designated public forum is a place" and noting that Widmar does not guarantee a religious organization access to "captive" school children); Bishop v. Aronov, 926 F.2d 1066, 1070-1071 (11th Cir. 1991) (finding that during class discussion, a university classroom is not

---

[8]The fact that Sino was sufficiently offended by the Centurions' presentation to walk out of a roll call does not make the atmosphere any less coercive.

a public forum). The fact that Clarke had previously permitted representatives from organizations with which the Department had partnered to make presentations and had allowed other organizations to post messages on the Department's bulletin board did not transform the leadership conferences or roll calls into public fora. A governmental body that invites a speaker to a meeting with its employees is not thereafter required to make its employees available to any organization that seeks to address them. See Berger, 982 F.2d at 1167 (stating that Widmar does not force school officials who expose children to one viewpoint to thereafter expose them to all viewpoints).

Defendants also argue that plaintiffs are being overly sensitive. Possibly, most deputies were not bothered by the Centurions' presentations. However, most deputies likely were Christians, who comprise the country's largest religious group. More deputies might have spoken up if Clarke had invited an Islamic organization to make a similar presentation.[9] In any case,

> [i]t is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment. The breach of neutrality that is today a trickling stream may all too soon become a raging torrent and, in the words of Madison, "it is proper to take alarm at the first experiment on our liberties."

Sch. Dist. of Abington v. Schempp, 374 U.S. 203, 225 (1963) (quoting Everson v. Bd. of Educ., 330 U.S. 1, 65 (1947)) (internal citations omitted).

To briefly summarize, defendants invited representatives of a Christian organization to present a proselytizing Christian message to deputies at meetings held at the workplace during working hours, which deputies were required to attend, and conveyed a message of

---

[9] It would follow from defendants' argument that Department leadership conferences and roll calls are public fora that defendants believe that they would have to permit representatives from all religious denominations to make presentations to deputies on the taxpayers' dime.

endorsement of the presentations. The effect of defendants' actions was to promote religion and to do so coercively. Thus, defendants violated the First Amendment's Establishment Clause.[10] See Vision Church, 468 F.3d at 993; Venters, 123 F.3d at 970; Kerr, 95 F.3d at 479-80; Berger, 982 F.2d at 1171.

## IV. FREE EXERCISE CLAIM

The Free Exercise Clause protects an individual's right to practice her religion without government restraint. Venters, 123 F.3d at 969-71 (holding that government violates the Clause when it conditions employment on the employee's conversion to another religion). Plaintiffs contend that defendants made Christianity a prerequisite for promotion, however, they present insufficient evidence to enable a reasonable observer to reach this conclusion. In supporting this allegation, plaintiffs rely primarily on the written material Clarke distributed at the leadership conference. As I have discussed, such material contributed to creating an impression that defendants were promoting religion, but it falls short of establishing a Free Exercise violation.

---

[10]Clarke and (through Clarke) Milwaukee County are primarily responsible for the constitutional violation. See generally Monell v. Dep't of Social Services, 436 U.S. 658 (1978); Abraham v. Piechowski, 13 F. Supp. 2d 870 (E.D. Wis. 1998). Bailey's personal involvement in the violation is a close call. However, Bailey took an affirmative role in setting up the Centurions' presentations and failed to take any action to alleviate the appearance of government endorsement of religion, and defendants have not argued that Bailey lacked personal involvement though plaintiffs moved for summary judgment as to each defendant. As such, I must conclude that Bailey did "know about the conduct and facilitate[d] it, . . . condone[d] it, . . . or turn[ed] a blind eye to it." See Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995).

-12-
Case 2:06-cv-00602-LA   Filed 09/25/07   Page 12 of 13   Document 78

## V. CONCLUSION

Therefore,

**IT IS ORDERED** that plaintiffs' motion for summary judgment is **GRANTED** on the issue of liability on their Establishment Clause claim and **DENIED** with respect to their Free Exercise Clause claim.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment is **GRANTED** with respect to plaintiffs' Free Exercise Clause claim and **DENIED** with respect to plaintiffs' Establishment Clause claim.

**IT IS FURTHER ORDERED** that a telephonic conference will be held on **November 6, 2007 at 10:30 a.m.** for the purpose of discussing how to proceed regarding remedies. The court will initiate the call.

Dated at Milwaukee, Wisconsin this 25 day of September, 2007.

/s_____
LYNN ADELMAN
District Judge

-13-
Case 2:06-cv-00602-LA   Filed 09/25/07   Page 13 of 13   Document 78